Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Joanna B. Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company, and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO
CASUALTY COMPANY,                                    Docket No.: _____(    )

                                      Plaintiffs,

        -against-                                    **Plaintiffs Demand a Trial**
                                        **by Jury**

DINESH VERMA MEDICAL, P.C.,
DINESH VERMA, D.O., and
JOHN DOE DEFENDANTS "1" – "10",

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against defendants, Dinesh Verma, D.O., Dinesh Verma Medical, P.C., and John Doe Defendants "1" - "10" (collectively, "Defendants") hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover monies that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent "No-fault" insurance charges relating to medically unnecessary, experimental, illusory, and otherwise non-reimbursable healthcare services, including so-called Nervomatrix Localized Intense Neurostimulation Therapy/Trigger Point Impedance Imaging ("Nervomatrix LINT/TPII Treatment") and Extracorporeal Shockwave Therapy ("ESWT") allegedly provided to New York automobile accident victims covered by policies of insurance issued by GEICO ("Insureds").

2.     Defendant Dinesh Verma, D.O. ("Dr. Verma") is a physician who purports to own Dinesh Verma Medical, P.C. ("Dinesh Verma Medical") that has billed GEICO approximately $2 million for the Nervomatrix LINT/TPII Treatment and ESWT (collectively, the "Fraudulent Services.")  Dr. Verma, colluding with John Doe Defendants "1" - "10", engaged in a scheme to exploit New York's No-fault insurance system by using Dinesh Verma Medical to render, or purport to render, a mix of medically unnecessary, excessive, and experimental services at multidisciplinary medical clinics that almost exclusively treat "No-fault" insurance patients (the "No-Fault Clinics").

3.     Defendants rendered, or purported to render, the Fraudulent Services at the No-Fault clinics indiscriminately, without any regard for genuine patient care, and solely based on their ability to exploit the patients for financial gain.  As part of the scheme, Defendants engaged in illegal referral and kickback arrangements to access a steady stream of patients for Dinesh Verma Medical so they could then fraudulently bill GEICO and other New York automobile insurers.

4.      In addition to recovering more than $173,000.00 stolen from it by Defendants, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,708,000.00 in pending No-fault insurance claims for the Fraudulent Services that have been submitted by or on behalf of Dinesh Verma Medical because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Dinesh Verma Medical was ineligible to bill for or to collect No-Fault Benefits; and

(iii)   the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

5.      The Defendants fall into the following categories:

(i)     Dinesh Verma Medical is a medical professional corporation through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Dr. Verma is a physician licensed to practice medicine in New York who purports to own and control Dinesh Verma Medical and who purports to perform some of the Fraudulent Services.

(iii)   John Doe Defendants "1" – "10" (the "Management Defendants") are persons and entities, presently not identifiable, who participated in and furthered the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of Dinesh Verma Medical and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Dinesh Verma Medical, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.      As discussed below, Dinesh Verma Medical, Dr. Verma, and the Management Defendants (collectively, the "Defendants") at all relevant times have known that: (i) the Fraudulent

Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Dinesh Verma Medical was ineligible to bill for or to collect No-Fault Benefits; and (iii) the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

7.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services billed to GEICO through Dinesh Verma Medical.

8.      The chart annexed hereto as Exhibit "1" set forth a representative sample of the fraudulent claims for the Fraudulent Services that GEICO has identified to-date that Defendants have submitted, or caused to be submitted, to GEICO.

9.      Defendants' fraudulent scheme perpetrated against GEICO and other New York automobile insurers began as early as 2019 and continues uninterrupted through present day as Defendants continue to seek collection on the Fraudulent Services.  As a result of Defendants' scheme, GEICO has incurred damages of more than $173,000.00.

## THE PARTIES

**I.      Plaintiffs**

10.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is

authorized to conduct business and to issue policies of automobile insurance in New York and New Jersey.

**II.**     **Defendants**

11.     Defendant Dr. Verma resides in and is a citizen of New York. Dr. Verma was licensed to practice medicine in New York on May 18, 2001, and purports to own Defendant Dinesh Verma Medical.

12.     Defendant Dinesh Verma Medical is a New York medical professional corporation, incorporated on or about June 27, 2019, with its principal place of business at 51 Atlantic Avenue, Floral Park, New York.

13.     John Doe Defendants "1" - "10" are additional individuals and entities whose names are not yet known to GEICO.  John Doe Defendants "1" - "10" at all times have participated in and furthered the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of Dinesh Verma Medical and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Dinesh Verma Medical, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

16.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

18.     GEICO underwrites automobile insurance in New York.

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

19.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

20.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" benefits or "PIP Benefits") to Insureds.

21.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

22.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those goods and services.

23.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known

as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

24.     In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

25.     Pursuant to the New York no-fault insurance laws, healthcare providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

26.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.  (Emphasis added).

27.     In New York physicians are prohibited from "exercising undue influence" on patients by promoting the sale of services to exploit the patients for financial gain or ordering excessive tests and treatments not warranted by the condition of the patient. See New York Education Law § 6530(17) and (35).

28.     Furthermore, in New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the

pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

29.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

30.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See e.g., New York Education Law §6512, §6530 (11), and (19).

31.     Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507.

32.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

33.     In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019) the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

34.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits.  There

is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

35.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services.  Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

36.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

37.     When a healthcare provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

38.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.      The Defendants' Fraudulent Scheme

### A.      Overview of the Scheme

39.      Beginning in 2019 and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which Dinesh Verma Medical was used to bill GEICO and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, experimental, excessive and otherwise unreimbursable healthcare services (i.e., the Fraudulent Services) allegedly provided to victims of automobile accidents generally suffering soft-tissue, musculoskeletal injuries.

40.      The Fraudulent Services included so-called (i) Nervomatrix Localized Intense Neurostimulation Therapy/Trigger Point Impedance Imaging – *i.e.*, Nervomatrix LINT/TPII Treatment -- virtually always resulting in charges of $2,455.00 per session and (ii) Extracorporeal Shockwave Therapy – *i.e.*, ESWT – almost always resulting in charges totaling $1,400.78 per session.  None of these purported services ever played a genuine role in the treatment or care of the Insureds.

41.      As discussed in more detail below, (i) there is no legitimate, peer-reviewed data that established the effectiveness of Nervomatrix LINT/TPII Treatment and, in fact, the Nervomatrix company itself ceased operations and dissolved and (ii) there is no legitimate, peer-reviewed data that established the effectiveness of ESWT for the treatment of back pain or neck

pain or other similar musculoskeletal conditions and, in fact, ESWT is considered experimental and has not been approved by the FDA for the treatment of such pain.

42.     Dinesh Verma Medical purports to be a legitimate medical professional corporation and healthcare practice but instead operates as part of a large-scale fraud scheme that exploits Insureds, as well as insureds of other New York automobile insurers, by providing medically unnecessary services.

43.     Dr. Verma did not operate Dinesh Verma Medical at any single, fixed office location, but Defendants instead used Dinesh Verma Medical to operate from various clinics which primarily treated No-fault patients (collectively, the "No-Fault Clinics"), where Dinesh Verma Medical received steady volumes of patients by accessing the patient base already established at each No-Fault Clinic through the payment of kickbacks for patient referrals.

44.     The Fraudulent Services billed under the name of Dinesh Verma Medical were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons in contravention of New York law.

**B.     Illegal Kickback and Referral Relationships**

45.     Dr. Verma did not market the existence of Dinesh Verma Medical to the general public.

46.     Dr. Verma did not advertise for patients, never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of Dinesh Verma Medical.

47.     To effectuate the scheme, Dr. Verma colluded with the Management Defendants to operate Dinesh Verma Medical on an indiscriminate basis, arbitrarily rendering or purporting to

render various medically unnecessary, experimental, and excessive healthcare services – solely to exploit patients for financial gain.

48.     Dr. Verma did not establish a practice at the various clinics from which Dinesh Verma Medical operated, but rather "walked" into the No-Fault Clinics which had their own, pre-existing patient bases, pursuant to arrangements made by the Management Defendants.

49.     Dr. Verma had no genuine doctor-patient relationship with the Insureds that visited the No-Fault Clinics, as the patients had no scheduled appointments with Dinesh Verma Medical.

50.     The Insureds that were subjected to services by Dinesh Verma Medical, to the extent any actual services were provided, were simply directed by the No-Fault Clinics to subject themselves to whatever treatment or service was being rendered, or purported to be rendered, by Dinesh Verma Medical that day, regardless of whether there was any legitimate need for healthcare services.

51.     Initially, after Dinesh Verma Medical was incorporated in 2019, the Defendants caused Dinesh Verma Medical to commence operations at No-Fault Clinics located at 3239 Route 112, Medford, New York, (the "3239 Route 112 Clinic"), 2799 Route 112, Medford, New York 11763 (the "2799 Route 112 Clinic") and 164-06 Northern Boulevard, Flushing, New York ("Northern Boulevard Clinic").

52.     In or about September 2019 Dinesh Verma Medical, under the control of the Management Defendants, began rendering and billing the same treatment for virtually every Insured, including Nervomatrix LINT/TPII Treatment.

53.     Thereafter, under the control of the Management Defendants, in or about July 2020, Dinesh Verma Medical abruptly stopped rendering Nervomatrix LINT/TPII Treatment and in or

about the fall of 2020 began treating patients with ESWT at the No-Fault Clinics, including a new clinic located at 160 Old Country Rd, Riverhead, New York ("Riverhead Clinic").

54.     From in or about the fall of 2020 to February 2022, virtually every bill submitted to GEICO by Dinesh Verma Medical has been for ESWT at the No-Fault Clinics.

55.     Dinesh Verma Medical suddenly stopped billing GEICO entirely in February 2022, yet Defendants continue to pursue collection from GEICO on the pending fraudulent billing for purported services allegedly rendered at the No-Fault Clinics.

56.     Insureds at the No-Fault Clinics were subjected to predetermined treatment protocols, regardless of the actual medical needs of the individual Insureds, in order to bill for the medically unnecessary services that were provided (or purported to be provided) by Dinesh Verma Medical and the other medical providers at the No-Fault Clinics.

57.     Unlicensed laypersons, rather than the healthcare professionals working at the No-Fault Clinics, cultivated and controlled the patient bases at these No-Fault Clinics and designed the fraudulent treatment and billing protocols used to maximize profits without regard to actual patient care.

58.     Notably, the other healthcare providers located at the No-Fault Clinics from where Dinesh Verma Medical operated, including entities to whom Dinesh Verma Medical paid rent, have been the subject of affirmative fraud litigation commenced by insurers or findings of professional misconduct.

59.     For example, David Dynof, M.D. ("Dr. Dynof") treated patients at the 2799 Route 112 Clinic and, upon information and belief, referred Insureds to Dinesh Verma Medical for the Fraudulent Services. Dr. Dynof has a history of professional misconduct which resulted in discipline from the New York State Board for Professional Medical Conduct (the "New York State Board")

that included a thirty-six-month period of probation for – among other things – rendering medically unnecessary services.

60.     In addition, Dr. Verma paid "rent" at the 3239 Route 112 Clinic to Todd Goldman, D.C. ("Goldman").  Goldman was sued for engaging in a fraudulent scheme in which, in exchange for illegal compensation, he prescribed medically unnecessary durable medical equipment and orthotic supplies. See Government Employees Insurance Company et al v. Elite Medical Supply of New York, LLC et al., 17-cv-03904 (JFB) (SIL) (E.D.N.Y. 2017).

61.     Defendants caused Dinesh Verma Medical to enter into illegal financial arrangements with the No-Fault Clinics in exchange for the referral of patients who could be subjected to the Fraudulent Services.

62.     The financial arrangements that Dr. Verma and Dinesh Verma Medical entered into included payments ostensibly to "rent" space, personnel, or equipment or fees for ostensibly legitimate business services.  However, these were "pay-to-play" arrangements that amounted to kickback payments in exchange for patient referrals to Dinesh Verma Medical for the medically unnecessary Fraudulent Services.

63.     The purported "lease" agreements Dinesh Verma Medical entered into in order to "rent space" at the No-Fault Clinics were shams to disguise the payment of kickbacks.

64.     In keeping with the fact that the "lease" agreements Dinesh Verma Medical entered into at the No-Fault Clinics were shams, Dinesh Verma Medical provided no legitimate or necessary services to the patients that warranted other providers at the No-Fault Clinics to bring in Dinesh Verma Medical to treat the patients.

65.     In further keeping with the fact that the "lease" agreements Dinesh Verma Medical entered into at the No-Fault Clinics were shams, the leases called for payments which were in excess

of the fair market value for leasing a small portion of space and/or non-exclusive space shared with numerous other healthcare providers.

66.     In reality, Dinesh Verma Medical made sham payments of "rent" at the No-Fault Clinics solely as part of "pay-to-play" arrangements that resulted in Insureds being referred to Dinesh Verma Medical at the No-Fault Clinics.

67.     Driven by the illegal kickbacks, when an Insured visited one of the No-Fault Clinics, he or she was automatically referred to the various healthcare providers operating from the Clinics, including Dinesh Verma Medical, despite the fact the Fraudulent Services never played a genuine role in the treatment or care of the Insureds.

68.     Absent these "pay-to-play" arrangements, healthcare providers operating at the No-Fault Clinics had no legitimate reason to refer Insureds to Dinesh Verma Medical since Dinesh Verma Medical provided no legitimate or necessary healthcare services to the Insureds.

69.     The amount of the kickbacks paid by Defendants generally was based on the volume of Insureds that were steered to Dinesh Verma Medical for the medically unnecessary Fraudulent Services.

70.     The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme. Defendants derived significant financial benefit from the relationships because without access to the Insureds, Defendants would not have the ability to execute the fraudulent treatment and billing protocol and to bill GEICO and other insurers huge sums for the Fraudulent Services.

71.     Furthermore, the Defendants would not have had access to the No-Fault Clinics and the Insureds but for the payment of kickbacks.

15

72.     The Defendants at all times knew that the kickback and referral arrangements were illegal and therefore took affirmative steps to conceal the existence of the fraudulent referral scheme.

III.     **The Defendants' Fraudulent Treatment and Billing Protocols**

73.     As part of their scheme to defraud, the Defendants rendered, or purported to render, a mix of medically unnecessary, excessive, and experimental services using fraudulent treatment and billing protocols to bill GEICO and the New York automobile insurance industry egregious amounts for performance of the Fraudulent Services.

74.     Virtually all the Insureds whom Dinesh Verma Medical purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom Dinesh Verma Medical purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

75.     Nevertheless, Dinesh Verma Medical, in accordance with e pre-determined fraudulent treatment and billing protocols, subjected Insureds to illusory, experimental, and medically unnecessary healthcare services regardless of the severity of the Insureds' injuries (or lack thereof).

76.     The treatments were administered pursuant to a pre-determined treatment protocol designed to maximize the billing that Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to them.

77.     As part of the scheme, Dinesh Verma Medical purported to subject the Insureds to the Fraudulent Services without regard for the Insureds' individual symptoms or presentation, or the absence of any medical problems arising from any actual automobile accidents.

78.     During the times Dinesh Verma Medical was providing Nervomatrix LINT/TPII

Treatment at the No-Fault Clinics, it did not perform a variety of treatments and services. Rather,

Nervomatrix LINT/TPII Treatment comprised approximately 100% of the total billing submitted

to GEICO by Dinesh Verma Medical.

79.     Similarly, during the times Dinesh Verma Medical was performing ESWT at the

No-Fault Clinics, it did not perform a variety of treatments and services, rather ESWT comprised

approximately 100% of the total billing submitted to GEICO by Dinesh Verma Medical, along

with sporadic evaluations on the same day as the ESWT.

80.     Dr. Verma permitted the fraudulent treatment and billing protocol described below

to proceed under his auspices solely to maximize profits and exploit Insureds for financial gain.

### A.     The Fraudulent Charges for Nervomatrix LINT/TPII Treatment

81.     Dinesh Verma Medical purported to subject Insureds to medically unnecessary

Nervomatrix LINT/TPII Treatments using a device created by a company called Nervomatrix (the

"Nervomatrix Device").

82.     The Defendants billed the Nervomatrix LINT/TPII Treatments to GEICO under

CPT codes 95999 and 99199 -- which codes are used for "unlisted" special services, procedure or

reports – because there is no listed CPT code for Nervomatrix LINT/TPII Treatments.

83.     The Defendants' charges to GEICO using the unlisted codes virtually always

resulted in a charge of $2,455.00 per session of Nervomatrix LINT/TPII Treatment.

84.     The Defendants' charges for the Nervomatrix LINT/TPII Treatments were

fraudulent in that the Nervomatrix LINT/TPII Treatments were medically useless and were

provided, to the extent they were provided at all, solely in order to maximize the billing submitted

to GEICO.

85. What is more, the Defendants' charges for the Nervomatrix LINT/TPII Treatments were fraudulent in that they misrepresented the nature of the service provided by the Nervomatrix LINT/TPII Treatment and, by extension, misrepresented the reimbursement to which Dinesh Verma Medical was entitled.

86. Additionally, the charges for the Nervomatrix LINT/TPII Treatments were fraudulent in that the Nervomatrix LINT/TPII Treatments were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks Dinesh Verma Medical paid to unlicensed laypersons who controlled the patients bases at the No-Fault Clinics.

87. Nervomatrix's Device purported to use proprietary technology that allegedly both diagnosed and treated trigger points, but there has never been any reliable, peer-reviewed data that established the effectiveness of the Nervomatrix Device or Nervomatrix LINT/TPII Treatment.  In fact, Nervomatrix itself ceased operations and dissolved.

       (i)       Standard of Care for the Diagnosis and Treatment of Trigger Points

88. Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

89. In a legitimate clinical setting, trigger points are diagnosed as part of a standard physical examination based upon pain that results when pressure is applied to a specific area of a patient's body.

90. In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

91.     Should an initial course of conservative therapies fail to remediate trigger points, trigger point injections may be warranted. Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

(ii)     The Medically Useless LINT/TPII Treatment

92.     Nervomatrix LINT/TPII Treatment purports to be a two-step process that allegedly both diagnoses and treats trigger points. First, the Nervomatrix Device allegedly identifies the most clinically relevant active trigger points along a person's skin by measuring electrical resistance on the skin surface, which generates a two-dimensional image of skin impedance. Then a moving row of twenty-six miniature probes that touch, but do not penetrate, the skin surface provide electrical pulses to the targeted trigger points. These electrical pulses purportedly stimulate the release of endorphins to alleviate a patient's pain.

93.     In reality, Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points.

94.     In keeping with the fact that Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, the Nervomatrix Device has never been approved by the United States Food and Drug Administration ("FDA") to be used in the diagnosis and treatment of trigger points.

95.     There are no reliable, peer-reviewed data that establish the effectiveness of the Nervomatrix Device and Nervomatrix LINT/TPII Treatment. To the contrary, studies have found that the Nervomatrix Device does not actually improve a patient's back pain and does not result in a better outcome than a placebo treatment. Notably, the only published data that contends the

Nervomatrix Device is effective in diagnosing and treating trigger points was published in 2011 by Dr. Miguel Gorenberg, the founder of Nervomatrix – the company that developed and manufactured the Nervomatrix Device.

96.     In further keeping with the fact that Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, Nervomatrix ceased operations in 2018 and was dissolved on February 17, 2019. In addition, the company's website, www.soleve.com, is no longer operational.

97.     In keeping with the fact that that Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for Nervomatrix LINT/TPII Treatment.

98.     Additionally, in keeping with the fact that the Nervomatrix LINT/TPII Treatment was performed pursuant to predetermined treatment protocols designed to maximize billing without regard for patient care, at times Dinesh Verma Medical did not conduct medical examinations to assess the Insureds' physical condition prior to administering Nervomatrix LINT/TPII Treatment instead performing the Nervomatrix LINT/TPII Treatment pursuant to purported referrals from other healthcare providers (the "Referring Providers").

99.     Dinesh Verma Medical, however, virtually never identified the Referring Providers who referred the Insured for Nervomatrix LINT/TPII Treatment.

100.     Moreover, Dinesh Verma Medical's medical records were misleading as they submitted letters of medical necessity to GEICO, copies of which are attached as Exhibit "2",

which suggested that the No-Fault Fee Schedule had established some standard of treatment with respect to Nervomatrix LINT/TPII Treatment when in fact it had not.

101.    In keeping with the fact that the Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and treatment of trigger points and was administered pursuant to a predetermined treatment and billing protocol, the putative "results" of the Nervomatrix LINT/TPII Treatments purportedly performed by Dinesh Verma Medical: (i) were not incorporated into any Insureds' treatment plans; (ii) played no legitimate role in the overall treatment or care of the Insureds; and (iii) had minimal, if any, impact on the Insureds' levels of back pain. For example,

(i)     An Insured named DM was allegedly involved in a motor vehicle accident on May 28, 2020. Thereafter he sought treatment at the No-Fault Clinics located at the 2799 Route 112 Clinic. On June 1, 2020, DM underwent a medical examination at DRD Medical with Dr. Dynof at which he reported his lower back pain was a 9/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to DM's lumbar region on July 3, 2020, July 17, 2020, July 22, 2020, and August 3, 2020. On August 3, 2020, DM underwent a follow up examination with DRD Medical at which he reported his lower back pain was a 10/10.

(ii)    An Insured named JS was allegedly involved in a motor vehicle accident on November 1, 2019. Thereafter he sought treatment at the 2799 Route 112 Clinic. On December 2, 2019, JS underwent a medical examination at DRD Medical with Dr. Dynof at which he reported his lower back pain was a 9/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to JS's lumbar region on December 3, 2019, December 10, 2019, December 17, 2019, and December 26, 2019. On December 30, 2019, JS underwent a follow up examination with DRD Medical at which he reported his lower back pain was a 10/10.

(iii)   An Insured named ZK was allegedly involved in a motor vehicle accident on September 9, 2019. Thereafter she sought treatment at the 2799 Route 112 Clinic. On May 6, 2019, ZK underwent a medical examination with DRD Medical with Dr. Dynof at which she reported her lower back pain was a 6/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to ZK's lumbar region on May 19, 2020, May 26, 2020, June 2, 2020, and June 9, 2020. On June 17, 2020, ZK underwent a follow up examination with DRD Medical at which she reported her lower back pain was a 7/10.

(iv)    An Insured named RZ was allegedly involved in a motor vehicle accident on June 1, 2019. Thereafter he sought treatment at the 2799 Route 112 Clinic. On July 15, 2019, RZ underwent a medical examination with DRD Medical with Dr. Dynof at which he reported his lower back pain was a 9/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to RZ's lumbar region on November 15, 2019, December 15, 2019, December 27, 2019, and January 16, 2020. On February 3, 2020, RZ underwent a follow up examination with DRD Medical at which he reported his lower back pain was an 8/10.

(v)    An Insured named ED was allegedly involved in a motor vehicle accident on August 23, 2019. Thereafter she sought treatment at the 2799 Route 112 Clinic. On October 7, 2019, ED underwent a medical examination with DRD Medical with Dr. Dynof at which she reported her lower back pain was a 9/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to ED's lumbar region on October 25, 2019, October 31, 2019, November 7, 2019, and November 15, 2019. On December 2, 2019, ED underwent a follow up examination with DRD Medical at which she reported her lumbar pain was a 10/10.

(vi)    An Insured named LB was allegedly involved in a motor vehicle accident on November 27, 2019. Thereafter she sought treatment at the 2799 Route 112 Clinic. On March 2, 2020, LB underwent a medical examination with DRD Medical with Dr. Dynof at which she reported her lower back pain was a 10/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to LB's lumbar region on May 28, 2020, June 10, 2020, June 17, 2020, and June 24, 2020. On August 17, 2020, LB underwent a follow up examination with DRD Medical at which she reported her lumbar pain was a 10/10.

(vii)    An Insured named RH was allegedly involved in a motor vehicle accident on April 24, 2020. Thereafter he sought treatment at the 2799 Route 112 Clinic. On May 4, 2020, RH underwent a medical examination with DRD Medical with Dr. Dynof at which he reported his lower back pain was a 9/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to RH's lumbar region on May 12, 2020, May 20, 2020, May 27, 2020, and June 3, 2020. On June 8, 2020, RH underwent a follow up examination with DRD Medical at which he reported his lower back pain was a 10/10.

(viii)    An Insured named SA was allegedly involved in a motor vehicle accident on October 23, 2019. Thereafter she sought treatment at the 2799 Route 112 Clinic. On December 2, 2019, SA underwent a medical examination with DRD Medical with Dr. Dynof at which she reported her lower back pain was a 4/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to SA's lumbar region on December 19, 2019, December 26, 2019, January 2, 2020, and January 8, 2020. On January 13,

2020, SA underwent a follow up examination with DRD Medical at which she reported her lower back pain was a 5/10.

(ix)     An Insured named LS was allegedly involved in a motor vehicle accident on November 26, 2019. Thereafter she sought treatment at the 2799 Route 112 Clinic. On December 9, 2019, LS underwent a medical examination with DRD Medical with Dr. Dynof at which she reported her lower back pain was an 8/10. Thereafter, Dinesh Verma Medical purported to administer Nervomatrix LINT/TPII Treatments to LS' lumbar region on December 12, 2019, December 20, 2019, December 26, 2019, and January 6, 2020. On January 13, 2020, LS underwent a follow up examination with DRD Medical at which she reported her lower back pain was a 9/10.

102.    These are only representative examples. In virtually all the claims for Nervomatrix LINT/TPII Treatment identified in Exhibit "1", the putative "results" of the Nervomatrix LINT/TPII Treatments purportedly performed by Dinesh Verma Medical: (i) were not incorporated into any Insureds' treatment plan; (ii) played no legitimate role in the overall treatment or care of the Insureds; and (iii) had minimal, if any, impact on the Insureds' levels of back pain.

103.    To create the false appearance that the Nervomatrix LINT/TPII Treatments provided quantifiable pain relief for the Insureds who were subjected to them, at the conclusion of each Nervomatrix LINT/TPII Treatment session Dinesh Verma Medical often purported to record the Insureds' subjective percentage of pain improvement from their baseline pain.

104.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in an automobile accident.

105.    It is extremely improbable – to the point of impossibility – that virtually all Insureds who received Nervomatrix LINT/TPII Treatments from the Defendants would experience a reduction in pain virtually every time they underwent Nervomatrix LINT/TPII Treatments.

(iii)    Defendants' Billing for Nervomatrix LINT/TPII Treatment

106.    Even if NERVOMATRIX LINT/TPII TREATMENT had any medical utility –
which it does not -- at best the NERVOMATRIX LINT/TPII TREATMENT machine treated
Insureds with electrical stimulation and therefore should be billed to insurance companies at a
significantly reduced rate, rather than the $2,455.00 per session charge billed by Defendants.

107.    Dinesh Verma Medical billed the Nervomatrix LINT/TPII services using CPT code
99199, which is described by the medical fee schedule as an "unlisted special service, procedure
or report, and CPT code 95999, which is described by the medical fee schedule as "other neurology
and neuromuscular procedures" and are assigned relative values "by report."

108.    Fees for procedures that are assigned "by report" must be justified by the nature,
extent, and need for the procedure or service, the time, skill, and equipment necessary.
Furthermore, the reimbursement rate established by the provider should be consistent in relativity
with other relative value units in the medical fee schedule.

109.    Inasmuch as LINT Treatment amounts to unattended electrical stimulation, this
type of electrical stimulation, to the extent it is reimbursable, should be billed under CPT codes
97014 and 97032 for a total value of $41.40 per thirty-minute treatment session.

110.    Furthermore, TPII purports to look for trigger points. Practitioners can manually
look for trigger points or use ultrasound guidance to identify trigger points for the purpose of
administering trigger point injections. When a practitioner chooses to use ultrasound guidance to
identify the location of trigger points it is billed under CPT code 76942. Because TPII purports to
provide a functionally equivalent service to ultrasound guidance, to the extent such ultrasound
guidance is reimbursable the appropriate fee reimbursement would be $262.91.

111.     Therefore, even if there was any basis for Dinesh Verma Medical to bill for Nervomatrix LINT/TPII Treatments -- in the absence of peer-reviewed data that establish the effectiveness of the treatments using a device from a company that ceased operations and dissolved -- the Defendants' charges misrepresented the nature of the services provided and inflated the billing by approximately eight times the amount that was appropriate, to the extent reimbursable in the first place.

112.     Finally, in addition to all of the above, in the claims for Nervomatrix LINT/TPII Treatments identified in Exhibit "1", the charges were fraudulent in that they misrepresented Dinesh Verma Medical's eligibility to collect No-Fault Benefits in the first instance because – as a result of the illegal kickback, improper financial arrangements and referral scheme described herein – Defendants were not in compliance with relevant laws and regulations governing healthcare practice in New York.

**B.     The Fraudulent Charges for ESWT**

113.     Dinesh Verma Medical purported to subject Insureds to medically unnecessary ESWT "treatments."

114.     Dinesh Verma Medical billed the ESWT to GEICO under CPT Code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging technology. Temporary codes may become permanent codes or may be deleted during updates of the code set.

115.     The Defendants' billing for ESWT through Dinesh Verma Medical under CPT code 0101T generally resulted in charges of $700.39 for each single treatment, with Dinesh Verma Medical typically purporting to provide two units of ESWT per day to each Insured, resulting in charges of $1,400.78 per Insured, per day.

116.     Dinesh Verma Medical typically billed GEICO for multiple treatment sessions of ESWT per Insured resulting in thousands of dollars of charges per Insured, with charges occasionally exceeding $25,000.00 per Insured.

117.     The Defendants' charges for the ESWT were fraudulent in that the ESWT was medically useless and was provided, to the extent it was provided at all, solely in order to maximize the billing submitted to GEICO.

118.     Additionally, the charges for the ESWT were fraudulent in that the ESWT was medically unnecessary and was performed – to the extent that it was performed at all – pursuant to the kickbacks Dinesh Verma Medical paid to unlicensed laypersons who controlled the patient bases at the No-Fault Clinics.

119.     During the relevant times herein, CPT code 0101T applied to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy".

120.     ESWT is a nonsurgical treatment that involves the delivery of high energy shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.

121.     During ESWT, the practitioner moves an applicator over a gel-covered treatment area. As the applicator is moved over the treatment area, pressure waves that purportedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

122.     Typically, Dinesh Verma Medical purported to perform ESWT on Insureds experiencing musculoskeletal pain, including cervical, thoracic, or lumbar spine pain, though at times Dinesh Verma Medical administered ESWT to Insureds' shoulders, hips, or other extremities.

123.    In a legitimate clinical setting, treatment for back pain and other musculoskeletal conditions should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

124.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication. These clinical approaches are well-established.

125.    By contrast, the use of ESWT for the treatment of cervical, thoracic, lumbar, shoulder, or knee musculoskeletal conditions is experimental and investigational.

126.    In keeping with the fact that ESWT for the treatment of cervical, thoracic, lumbar, shoulder, or knee musculoskeletal conditions is not a legitimate treatment option, ESWT has not been approved by the FDA for the treatment of these musculoskeletal conditions.

127.    Indeed, the only FDA approved uses for ESWT are the treatment of plantar fasciitis, (i.e., heel pain) and lateral epicondylitis (i.e., tennis elbow).

128.    What is more, there is insufficient peer-reviewed data that establish the effectiveness of ESWT for the treatment of cervical, thoracic, lumbar, shoulder, or knee musculoskeletal conditions.

129.    Furthermore, the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

130.     In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i)  Medicare does not consider ESWT reasonable or necessary for the treatment of musculoskeletal conditions and therefore does not cover it; (ii) Aetna insurance company considers ESWT experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (iii) UnitedHealth Group Incorporated does not cover ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iv) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (v) Cigna considers ESWT experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

131.     Therefore, in the claims for ESWT identified in Exhibit "1", Dinesh Verma Medical falsely represented that the ESWT that it purported to provide to Insureds was medically necessary, when in fact it was not.

132.     As with the other Fraudulent Services, the ESWT was administered pursuant to a predetermined fraudulent treatment and billing protocol, designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

133.     At times, Dinesh Verma Medical did not conduct medical examinations to assess the Insureds' physical condition prior to administering ESWT. Instead, the medical examinations were conducted after several ESWT treatment sessions.

134.     To obscure the fact that Dinesh Verma Medical administered ESWT pursuant to a predetermined treatment protocol, and illegal, collusive arrangements with Referring Providers,

Dinesh Verma Medical virtually never identified the Referring Providers in their billing submissions to GEICO.

135.    In keeping with the fact that the ESWT is medically useless for the treatment of back and neck pain or other similar musculoskeletal conditions, the putative "results" of the ESWT purportedly performed by Dinesh Verma Medical: (i) were not incorporated into any Insureds' treatment plans; (ii) played no legitimate role in the overall treatment or care of the Insureds; and (iii) had minimal, if any, impact on the Insureds' levels of back or extremity pain.

136.    In fact, Insureds who received ESWT from Dinesh Verma Medical frequently failed to undergo any subjective or objective testing to assess whether the ESWT resulted in a reduction in pain and/or increased range of motion in the treated area.

137.    Rather, virtually all medical records generated as a result of the ESWT contained preprinted boilerplate language indicating the Insureds experienced some improvement in pain at the conclusion of each follow-up ESWT session.

138.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in an automobile accident.

139.    The majority of the Insureds whom Dinesh Verma Medical purported to treat were involved in relatively minor "fender bender" accidents, to the extent that they were involved in any actual accident at all. It is highly improbable that most of these Insureds would achieve some amount of pain relief after each session of ESWT regardless of (i) how much pain they were purportedly suffering initially; (ii) how long after their accidents they began treatment; and (iii) what other "treatments" they were receiving concurrently with the ESWT.

140.     In further keeping with the fact that the ESWT provided by Dinesh Verma Medical was fraudulent, and rendered pursuant to predetermined protocols, Dinesh Verma Medical used preprinted boilerplate language for every patient in his treatment reports regardless of any patient's individual circumstances or where the patient was in the treatment cycle.

141.     Additionally, Dinesh Verma Medical purported to provide the same frequency of treatment, using the same boilerplate language in each ESWT treatment report for Insureds very early in the treatment cycle, sometimes within days of the Insured's accident (without giving the patients the opportunity to sufficiently respond to conservative physical therapy) and/or late in the treatment cycle (without any consideration or discussion of the patient's response to other prior treatments).

142.     For example, many Insureds were subjected to the experimental ESWT treatments by Dinesh Verma Medical less than 20 days after their accidents.  For example:

(i)      The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named E.R. on December 7, 2021, only four days after the Insured's accident on December 3, 2021.

(ii)     The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named N.H. on August 3, 2021, only nine days after the Insured's accident on July 25, 2021.

(iii)    The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named K.L. on November 23, 2021, only four days after the Insured's accident on November 19, 2021.

(iv)     The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named J.C. on January 13, 2021, only two days after the Insured's accident on January 11, 2021.

(v)      The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named T.C. on January 13, 2021, only two days after the Insured's accident on January 11, 2021.

(vi)     The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named P.G. on December 23, 2020, only seven days after the Insured's accident on December 16, 2020.

(vii)    The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named R.D. on January 25, 2022, only eleven days after the Insured's accident on January 14, 2022.

(viii)   The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named C.V. on November 9, 2020, only seven days after the Insured's accident on November 2, 2020.

(ix)     The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named S.S. on October 5, 2020, only three days after the Insured's accident on October 2, 2020.

(x)      The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named C.D. on November 2, 2021, only eight days after the Insured's accident on October 25, 2021.

(xi)     The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named H.F. on November 2, 2021, only eight days after the Insured's accident on October 25, 2021.

(xii)    The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named S.W. on November 2, 2021, only eight days after the Insured's accident on October 25, 2021.

(xiii)   The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named E.B. on February 8, 2022, only six days after the Insured's accident on February 2, 2022.

(xiv)    The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named Z.C. on November 2, 2021, only nine days after the Insured's accident on October 24, 2021.

(xv)     The Defendants purported to provide ESWT through Dinesh Verma Medical to an Insured named E.D. on February 12, 2021, only seven days after the Insured's accident on February 5, 2021.

143.    In further keeping with the fact that the ESWT treatments purportedly performed by Dinesh Verma Medical were not medically necessary and were performed pursuant to predetermined protocols to maximize profits, multiple Insureds of different ages and suffering different injuries, but involved in the same accident, were purportedly provided same number of treatment sessions of ESWT by Dinesh Verma Medical. For example:

(i)     Two Insureds – H.K. and T.K. were involved in the same automobile accident on August 22, 2021. Thereafter, both of these Insureds received two sessions of the experimental ESWT.

(ii)     Three Insureds – C.D., H.F, and S.W. were involved in the same automobile accident on October 25, 2021. Thereafter, all three of these Insureds received four sessions of the experimental ESWT.

(iii)    Two Insureds – B.Y. and B.Z. were involved in the same automobile accident on February 20, 2021. Thereafter, both of these Insureds received two sessions of the experimental ESWT.

(iv)    Two Insureds – J.K. and J.N. were involved in the same automobile accident on July 16, 2021. Thereafter, both of these Insureds received ten sessions of the experimental ESWT.

(vi)    Two Insureds – W.S. and Y.Z. were involved in the same automobile accident on November 15, 2021. Thereafter, both of these Insureds received two sessions of the experimental ESWT.

144.    Moreover, even if Dinesh Verma Medical somehow provided legitimate high energy extracorporeal shockwave treatments in compliance with the code requirements – which it did not – the Defendants nevertheless inflated the charges permissible for such high energy extracorporeal shockwave services.

145.    For qualifying services, CPT code 0101T allows a single charge for "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy."

146.    The Defendants, in order to fraudulently inflate the charges to insurers, typically billed for multiple charges per day for each Insured based on the number of body parts that were provided with extracorporeal shockwave services, rather than billing a single charge for services involving the musculoskeletal system.

147.    In short, the billing for extracorporeal shockwave treatments by Dinesh Verma Medical was part of the Defendants' fraudulent treatment and billing protocol, was designed solely to financially enrich the Defendants, and had absolutely nothing to do with genuine patient care.

148.    Finally, in addition to all of the above, in the claims for ESWT identified in Exhibit "1", the charges were fraudulent in that they misrepresented Dinesh Verma Medical's eligibility to collect No-Fault Benefits in the first instance because – as a result of the illegal kickback,

improper financial arrangements and referral scheme described herein – they were not in compliance with relevant laws and regulations governing healthcare practice in New York.

## IV.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to  GEICO

149.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted thousands of charges (i.e., bills, NF-3 forms, HCFA-1500 forms) and/or treatment reports through Dinesh Verma Medical to GEICO seeking payment for the Fraudulent Services for which Defendants were not entitled to receive.

150.    The bills and treatment reports submitted to GEICO by and on behalf of Dinesh Verma Medical were false and misleading in the following material respects:

- the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

- Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Dinesh Verma Medical was ineligible to bill for or to collect No-Fault Benefits; and

- the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

## V.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

151.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

152.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systemically concealed their fraud.

153.    Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to

fraudulent predetermined protocols designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

154.    Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were performed pursuant to illegal kickback and referral arrangements.

155.    Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that Dinesh Verma Medical engaged in illegal fee splitting with non-physicians in violation of New York law.

156.    In fact, among other things, Defendants rendered, or purported to render, the Fraudulent Services at different No-Fault Clinics indiscriminately and at different times in order to conceal the volume of billing for any particular service and the volume of billing from any particular clinic.

157.    Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that Defendants unlawfully exchanged kickbacks for patient referrals.

158.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

159.    Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the

Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

160.     GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is under statutory and contractual obligations to process claims promptly and fairly within 30 days.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did, cause GEICO to rely upon them.

161.     As a result, GEICO incurred damages of more than \$\$72,130.00 based upon the fraudulent charges.

162.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint

<u>**AS AND FOR A FIRST CAUSE OF ACTION**</u>
**Against All Defendants**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

163.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

164.     There is an actual case and controversy between GEICO and the Defendants regarding more than \$1,708,000.00 in pending fraudulent billing from Dinesh Verma Medical for the Fraudulent Services.

165.     Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Dinesh Verma Medical because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to

pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

166.    Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Dinesh Verma Medical because Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Dinesh Verma Medical was ineligible to bill for or to collect No-Fault Benefits.

167.    Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Dinesh Verma Medical because the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

168.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Dinesh Verma Medical.

**SECOND CAUSE OF ACTION**
**Against Dr. Verma and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

169.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

170.    Dinesh Verma Medical, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

171.    Dr. Verma and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Dinesh Verma Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted

hundreds of fraudulent charges on a continuous basis for more than two years seeking payments that Dinesh Verma Medical was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Dinesh Verma Medical was ineligible to bill for or to collect No-Fault Benefits; and (iii) the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

172.   Dinesh Verma Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Verma and the Management Defendants operated Dinesh Verma Medical, inasmuch as Dinesh Verma Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Dinesh Verma Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Dinesh Verma Medical to the present day. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

173.   Dinesh Verma Medical is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it provides no medically necessary or

legitimate services and its operation is only possible through its engagement in illegal fee-splitting, kickback, and referral arrangements. Dinesh Verma Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Dinesh Verma Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

174.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $173,000.00 pursuant to the fraudulent bills submitted by the Defendants through Dinesh Verma Medical.

175.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Dr. Verma and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

176.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

177.    Dinesh Verma Medical, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

178.    Dr. Verma and the Management Defendants are employed by and/or associated with the Dinesh Verma Medical enterprise.

179.    Dr. Verma and the Management Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Dinesh Verma Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Dinesh Verma Medical was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Dinesh Verma Medical was ineligible to bill for or to collect No-Fault Benefits; and (iii) the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

180.    Dr. Verma and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

181.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $173,000.00 pursuant to the fraudulent bills submitted by the Defendants through Dinesh Verma Medical.

182.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Dinesh Verma Medical, Dr. Verma, and the Management Defendants**
**(Common Law Fraud)**

183.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

184.    Dinesh Verma Medical, Dr. Verma, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

185.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to predetermined, fraudulent protocols without regard to genuine patient care; (ii) in every claim, the representation that Dinesh Verma Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Defendants engaged in illegal fee-splitting, kickback, and referral arrangements; and (iii) in every claim, the representation that  the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

186.    Dinesh Verma Medical, Dr. Verma, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a

calculated effort to induce GEICO to pay charges submitted through Dinesh Verma Medical that were not compensable under the No-Fault Laws.

187.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $173,000.00 pursuant to the fraudulent bills submitted by the Defendants through Dinesh Verma Medical.

188.    Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

189.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Dinesh Verma Medical, Dr. Verma and the Management Defendants
### (Unjust Enrichment)

190.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

191.    As set forth above, Dinesh Verma Medical, Dr. Verma and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

192.    When GEICO paid the bills and charges submitted by or on behalf of Dinesh Verma Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

193.    Dinesh Verma Medical, Dr. Verma, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

194.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

195.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $173,000.00.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against the Management Defendants**
**(Aiding and Abetting Fraud)**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

197.    The Management Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dr. Verma and Dinesh Verma Medical.

198.    The acts of the Management Defendants in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of Dinesh Verma Medical and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Dinesh Verma Medical, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

199.    The conduct of the Management Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the Management Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Dr. Verma or Dinesh Verma Medical to obtain referrals of patients at the No-Fault Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

200.    The Management Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Dr. Verma and Dinesh Verma Medical for medically

unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

201.    The conduct of the Management Defendants caused GEICO to pay more than $149,000.00 pursuant to the fraudulent bills submitted through Dinesh Verma Medical.

202.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

203.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages of at least $173,000.00, along with punitive damages, interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

204.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Dr. Verma and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $173,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Dr. Verma and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$173,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against Dinesh Verma Medical, Dr. Verma, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $173,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against Dinesh Verma Medical, Dr. Verma, and the Management Defendants, more than $173,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper; and

F. On the Sixth Cause of Action against the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $173,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: May 17, 2022

RIVKIN RADLER LLP

By: ___/s/ Michael A. Sirignano___
    Barry I. Levy, Esq.
    Michael A. Sirignano, Esq.
    Joanna B. Rosenblatt, Esq.
    926 RXR Plaza
    Uniondale, New York 11556
    (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*